**Henry Brichacek, Plaintiff-Appellee, v. Jon Hampton, Defendant-Appellant.**

**Gen. No. 49,344.**

First District, Fourth Division.
December 9, 1964.
Rehearing denied December 30, 1964.

Morton H. Meyer, Gerrard & Gerrard, all of Chicago (Michael A. Gerrard and Allen S. Gerrard, of counsel), for appellant.

Reibman and Hoffman, of Chicago, for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken from a judgment on the verdict entered in the Superior Court of Cook County in favor of Henry Brichacek and against Jon Hampton for the sum of $17,500. The only questions which are raised in this court are: 1st, that the judgment is against the manifest weight of the evidence; and 2nd, that the judgment of $17,500 is excessive and was the result of passion, prejudice or sympathy.

The only facts not in controversy are that the accident occurred on Saturday, June 16, 1962, at 8:-40 a. m., at the intersection of Oakley Boulevard, which runs north and south, with Lake Street, which runs east and west, in the City of Chicago. Oakley Boulevard is 42 feet wide; Lake Street is 48½ feet wide. The day was clear, with good visibility. The

plaintiff was struck on his left side by the right front fender of defendant's car.

The other facts are sharply contested. The plaintiff, a mail carrier, 66 years of age, was engaged at the time of the accident in picking up and delivering mail. He used his private car that day and had parked it on the south side of Lake Street in the bus stop, "about even with the west curb line." He testified that he got out of his car and went across Lake Street to the northwest corner where there is a mailbox from which he was to have made a collection. He opened the box, found no mail, locked the box, looked at the traffic lights, which were green in his favor, glanced east and west, and saw no traffic coming, although there was a bus standing at the corner, going east, with a couple of cars behind it. He then proceeded across Lake Street on the green light. After he noticed the light was green he looked towards the left, or east, and saw nothing coming. After he had made a couple of steps into Lake Street he was hit on the left side and was thrown about 10 or 15 feet, landing about 8 or 10 feet west of the sidewalk. He further stated that "the impact itself occurred in relation to the west curb line where the imaginary pedestrian lines would be."

On cross-examination, the plaintiff admitted that in his deposition he had testified that his car was parked on the southwest corner of Lake and Oakley about 15 or 20 feet from the corner, with the front end of his car in the bus stop. On the southwest corner of the intersection of Lake and Oakley, there was a traffic-control signal about 5 or 6 feet west of the west curb of Oakley and west of the crosswalk. He also testified that the mailbox was on the west edge of the west crosswalk and that his car was west of that mailbox.

287

He testified that he never saw the defendant's car at any time before the accident and that he was 6, 8 or 10 feet, or maybe two steps more, in Lake Street when he was struck by the car. The plaintiff testified:

> As I was crossing the street, I centered my attention on the south of the direction I was walking.
>
> Mr. Gerrard: Q. Now, will you answer my question, please. Did you at any time either look to your left or to your right from the moment you left that sidewalk until this occurrence took place?
>
> A. I said as I crossed, I looked, and I didn't see anything—
>
> Q. Will you please answer my question.
>
> Mr. Reibman: Objection, Judge. He has answered it.
>
> The Court: He said he didn't look to the right or left.
>
> Mr. Gerrard: All right. May the record show that that is the answer?
>
> The Court: That's what he said.
>
> Mr. Reibman: He said he did look, and he didn't see it.
>
> The Court: He said he was looking at the stop light. Go ahead.

That statement could be construed as meaning that the plaintiff had looked as he was crossing the street in spite of the interpretation placed on it by counsel for plaintiff and the court, neither of which could be controlling on the jury.

Hampton, the defendant and driver of the car, testified at the trial that he was driving west on Lake Street at about 15 to 23 miles an hour. He was in the center lane, 30 or 50 feet from the intersection, when he first noticed the traffic signals. At that time the light was amber and then changed to green in his

favor. At that time the defendant first saw the plaintiff, and the time he first noticed him he continued to watch him. The plaintiff, when defendant first noticed him, was 5 or 6 feet south of the north curb line of Lake Street, going across Lake Street, and 10 to 15 feet from the west curb of Oakley. The defendant testified that the plaintiff was walking in a westerly direction on Lake Street, and that shortly before the impact, the plaintiff turned to face south. He also testified that he blew his horn. This is not corroborated by any other witness.

The defendant was questioned with reference to a police report he signed at the scene of the accident, and he testified that at that time he had said:

> "I was west bound on Lake Street, and at the intersection of Oakley Boulevard I saw this man crossing Lake Street from the north side—from the north side of Lake Street going south in the west crosswalk of Lake Street at Oakley Boulevard. I blew my horn and applied my brakes, and my car skidded, causing the right front of my car to come in contact with this man. . . ."

None of the other witnesses who testified for the defendant saw the impact. One witness testified that at the time the plaintiff hit the street he was 18 or 20 feet from the west curb and 6 or 8 feet from the north curb. Another witness testified that at the time the plaintiff was knocked down by defendant's car the plaintiff was 50 feet from the west curb of Oakley Boulevard.

■ The testimony as to where the plaintiff had parked his own car is in sharp conflict. The plaintiff testified that he had entered at the intersection on the green light. Nowhere is that statement contradicted in the evidence. It is not necessary to point out many other conflicting statements which appear in the rec-

ord. It is a well established rule that a reviewing court will not set aside a verdict based on conflicting evidence.

In Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836, the court said:

"... Under our system of jurisprudence, jury determinations can be set aside only when a court of review, or a trial court upon proper motion, is clearly satisfied that they were occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence. . . ."

In Vasic v. Chicago Transit Authority, 33 Ill App 2d 11, 180 NE2d 347, the court said:

"A court of review in passing on the question of whether the verdict is against the manifest weight of the evidence must take into consideration not only the verdict of the jury but the fact that the trial judge also saw and heard the witnesses, heard arguments of counsel, and then denied the motion for new trial. . . ."

■■ The trial court has the right to set aside a verdict when it is against the weight of the evidence, but a reviewing court can only act when the verdict is against the manifest weight of the evidence. Read v. Cummings, 324 Ill App 607, 59 NE2d 325. See Vasic v. Chicago Transit Authority, supra.

■■ Questions of negligence on the part of the defendant or contributory negligence on the part of the plaintiff are ordinarily questions of fact for the jury to determine. Negligence or contributory negligence becomes a question of law only when the evidence is so clearly insufficient to establish due care

that all reasonable minds must reach that conclusion. Pennington v. McLean, 16 Ill2d 577, 158 NE2d 624.

Section 129 of chapter 95½ of the Uniform Traffic Act provides that where the traffic is controlled by traffic-control signals, when the signal is green, vehicles facing the signal may proceed, but the right-of-way shall be yielded to other vehicles or pedestrians within the intersection at the time such signal is exhibited, and the pedestrians facing the signal may proceed across the roadway within any marked or unmarked crosswalk.

There is conflict in the testimony in the instant case as to whether or not the plaintiff was proceeding across the street in an unmarked crosswalk. The plaintiff testified he was; the defendant testified he was not.

■■ The defendant was impeached by a statement admittedly made by him to the police at the time of the accident. One witness testified that when he saw the man lying in the street he was 15 or 20 feet from the western curb lane of Lake Street, but that when he was hit he had bounced 5 or 10 feet. It can be definitely said that in the instant case the questions of negligence on the part of the defendant and contributory negligence on the part of the plaintiff were matters which had to be submitted to the jury for its determination.

Chapter 95½, Motor Vehicles (Ill Rev Stats 1963, c 95½, § 170) provides that pedestrians shall be subject to traffic control signals at intersections. It further provides. [§ 172] that where a pedestrian at an intersection crosses a roadway outside the crosswalk he shall yield the right-of-way to vehicles. However, in subparagraph (d) of sec 172, it is provided that notwithstanding the provisions of the section every driver

of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary.

 The plaintiff testified that he had looked when he entered the street, and his subsequent testimony could properly be interpreted that he looked after he had entered the intersection. In Moran v. Gatz, 390 Ill 478, 62 NE2d 443, the Supreme Court held that it has long been the rule in Illinois that the driver of a vehicle on a city street is charged with the duty to exercise reasonable care in the operation of his vehicle and to have the vehicle under such control as will enable him to avoid collision with other vehicles or pedestrians. "He is charged with notice that pedestrians may cross the street over which he is driving, and other vehicles may be traveling over a cross street. . . ." It is further held that it is the pedestrian's duty to so conduct himself as to be free from contributory negligence.

Among other cases, the court cites McDonald v. Wickstrand, 206 Wis 58, 238 NW 820, where the court in passing upon a statute similar to ours, gave the pedestrian the right-of-way, holding that the plaintiff was unquestionably where he had a right to be and was entitled to the benefit of the assurance that the law required oncoming drivers to yield him the right-of-way. In that case it was also held, however, that the fact of plaintiff's right in this regard did not excuse negligence on his part contributing to the injury, and the question as to what constituted reasonable observation before entering upon the crossing was an issue to be considered by the jury in determining whether or not his conduct was negligent.

After citing and quoting from many cases from other jurisdictions, the Illinois Supreme Court said, at page 485 of the Moran case:

"The generally accepted rule is that while a statute such as ours gives pedestrians the right of way, it does not confer upon them an advantage which necessarily absolves them from guilt of contributory negligence. Each case must be determined from its particular facts. The question of contributory negligence is one which is pre-eminently for the consideration of a jury. It cannot be defined in exact terms and unless it can be said that the failure of the plaintiff to look again was so palpably contrary to the conduct of a reasonably prudent person as to show contributory negligence, the issue is one for the jury. . . .

"The rule seems to be quite universal that a pedestrian's failure to keep a constant lookout, or to look again after having determined that he can safely cross ahead of approaching traffic, is not contributory negligence as a matter of law but it is a question for a jury whether he was in the exercise of ordinary care for his own safety. [Citing cases.]"

See Vasic v. Chicago Transit Authority, supra, where this court sustained a jury verdict for the defendant under almost similar circumstances to those in the instant case. Also see Anthony v. Yellow Cab Co., 50 Ill App2d 108, 200 NE2d 148.

The verdict of the jury in the instant case was not against the manifest weight of the evidence.

Defendant also argues that since the jury returned a verdict of $17,500 it would indicate that they were influenced by passion or prejudice, because of certain things which occurred in the trial of the case. The plaintiff testified that he was 66 years old and had been a mail carrier for 37 years; that after he was struck he tried to get up but was in a state of

shock. He was then taken to Presbyterian-St. Luke's Hospital where he was given treatment and X-rays were taken of his leg. It was found that his leg was fractured. He testified as to pain in his leg, hip and both of his ankles. A cast was placed on his leg and remained there for about two or three weeks, after which time X-rays were again taken and another cast placed on his leg. The witness testified that during the third or fifth week he had a sharp, shooting pain in his "left chest." The cast was on his leg for about nine or ten weeks, then he was given therapy treatments to take the soreness out of his leg. He walked on crutches for about six or seven weeks. He was given bending exercises and suffered leg pain during that period. He was out of work from June 16 until October 3. His daily pay averaged $21.55. After October 3 he again started to work as a mail carrier. However, he found that when he got home his leg was sore; that he got pains at night and when the weather changed.

After he was taken to Presbyterian-St. Luke's Hospital the plaintiff was transferred to the U. S. Public Health Service Hospital, where Dr. Robert Frederick Smith, a specialist in orthopedics, who was a witness for the plaintiff, examined him on August 13. Dr. Smith testified that at that time the plaintiff was convalescing from an injury to his left knee and he limped when he attempted to walk. The X-rays taken in August, according to the witness, showed two fractures; one in the smaller bone and one in the larger bone of the lower leg, and there was evidence of the healing of a third fracture in the portion of the larger bone of the lower leg. At the time the doctor examined him the plaintiff complained of pain. Dr. Smith was asked if this was a permanent injury, and the defendant's objection was sustained by the court.

294

The doctor then testified that the injury could not heal to the pre-injury stage.

Dr. Smith also testified that while the October X-ray showed evidence of healing it also showed a persistent deformity. It did not show a normal knee joint.

Dr. Donald Miller was a witness on behalf of the plaintiff, and qualified himself as an expert in orthopedics. He testified that he first saw the plaintiff on December 30, 1962, and that he again saw him on May 13, 1963, and took X-rays. He was asked, without objection, a hypothetical question,* and in response to that question made the following statement: "My opinion is that this imaginary person, hypothetical has suffered a permanent condition; that is, an injury for an indefinite time, until death."

The defendant had as his witness Dr. Leo Frederick Miller, a specialist in orthopedics, who examined the plaintiff on March 19, 1963, in his office. Dr. Miller described his findings, stating that the plaintiff walked and bent over normally. A neurological examination did not reveal anything wrong with the plaintiff. He examined the X-rays of October 22 and stated that the fractures of the fibula and of the tibia plateau were relatively healed and that there was a complete restitution of the fracture and no disturbances of the knee joint itself.

On cross-examination, the witness testified that the plaintiff complained of soreness in his left knee joint which became more pronounced with weather changes, and that the condition would be commensurate with the type of injuries which he had. He further testified that "When I said that the fractures were healed, I meant by 'healed,' the restitution of bone in

---

* The hypothetical question does not appear in the abstract although it is in the record.

various conditions is going on and seen for years to come. When you talk about the word 'healed,' you see the whole picture."

The judgment of $17,500 is not excessive if the jury found, as they could have properly found from the evidence, that the injuries which the plaintiff received were permanent. In Barango v. E. L. Hedstrom Coal Co., 12 Ill App2d 118, 138 NE2d 829, we said: "There is no precise rule by which an award of damages can be fixed in an action for personal injuries because compensation for them does not lend itself to mathematical computation." And in the same case we quote from "Damages in Accident Cases" by James, in 41 Cornell Law Quarterly, p 582, where it is said:

> ". . . '[W]hoever does an injury to another is liable in damages to the extent of that injury.' [Dexter v. Spear, 7 Fed Cas 624, No 3867 CCDRI 1825.] Sometimes this can be accomplished with a fair degree of accuracy. But obviously it cannot be done in anything but a figurative and essentially speculative way for many of the consequences of personal injury. Yet it is the aim of the law to attain at least a 'rough correspondence between the amount awarded as damages and the extent of the suffering,' [Restatement, Torts sec 903, comment a] or other intangible loss . . . ."

The defendant also urged that he should have been permitted to argue to the jury that two witnesses who had testified in the trial on behalf of the defendant had been interviewed by a representative of the plaintiff; that the defendant brought them into court as his witnesses and therefore, the defendant had a right to comment to the jury on the fact that the plaintiff had not produced the witnesses in court. This point merits very little discussion. It is, of course,

296

the rule that where a witness is available and is not called by a party, it is presumed that his testimony would be adverse to the party and, therefore, in argument counsel can comment on that fact. Santiemmo v. Days Transfer, Inc., 9 Ill App2d 487, 133 NE2d 539.

 Where a witness is known to the plaintiff and has been interviewed by him, is subsequently subpoenaed and has testified on behalf of the defendant in the trial, it is the height of absurdity to say that counsel for the defendant would be entitled to comment on the failure of the plaintiff to produce the witness. The only purpose for such comment in any case is to permit the jury to draw an inference that the testimony of the witness would be against the plaintiff. When the witness testifies in open court there is no place for such an inference. The ruling of the court was correct.

 The court admitted, on behalf of the plaintiff, a plea of guilty by the defendant to the two charges in the traffic court; one, disregarding the rights of the pedestrian in the crosswalk; and the other, failing to decrease his speed at a special hazard intersection with respect to a pedestrian. Defendant's plea of guilty to the charges in the traffic court was properly admitted. 18 ILP Evidence, § 136; Cammarano v. Gimino, 234 Ill App 556. In Galvan v. Torres, 8 Ill App2d 227, 131 NE2d 367, it was held that a plea of guilty to a criminal indictment for assault and battery is admissible in evidence in a civil case, based upon the same assault and battery as it is in an admission against interest.

In plaintiff's direct testimony he stated that after the accident he had heart pains and a sharp, shooting pain in the upper left quadrant of his chest. Counsel for defendant objected and counsel for plaintiff said he would connect it up by medical testimony.

When Dr. Robert Frederick Smith, who had quali-
fied himself as a specialist in orthopedics, was testify-
ing on behalf of the plaintiff he was asked a question,
hypothetical in form, and in that question was incor-
porated the following statement:

> ". . . assume further that the patient's com-
> plaints of pains in and about the heart—in and
> about the chest area. Do you have an opinion
> based upon your experience as a physician as to
> what could or might have caused this pain in and
> about the chest?"

The defendant's objection was then sustained
by the court. Dr. Smith was employed by the U. S.
Public Health Service Hospital. He had with him the
medical records and X-rays relating to the injuries
incurred by the plaintiff. He had not examined the
plaintiff until August 13. The accident occurred on
June 16. The question which the plaintiff's counsel
was asking of Dr. Smith was an attempt to connect
up the testimony given by the plaintiff with reference
to his chest pains. He was prevented from so doing
by defendant's objection. Defendant cannot complain
in this court that the evidence was not properly con-
nected up.

The defendant also urged that plaintiff's counsel
improperly said in his opening statement that he
would show that plaintiff suffered the same type of
pain as someone who had suffered a heart attack
with a blood clot entering his heart.

The defendant insists that the statement made by
the counsel for the plaintiff was made in bad faith;
that he knew he could not connect it up and that the
clinical records of the U. S. Public Health Service
Hospital did not so indicate. During oral argument
counsel agreed that they would present to this court

a copy of that record. The record had not been introduced in evidence, although it had been marked in the trial court for identification. When the record was produced it substantiated the statement of the plaintiff with reference to the cause of the chest pains; and it further stated, as a final diagnosis, that among "conditions due to injury of June 16, 1962," was "pulmonary infarct, post-injury."

Since the document was not offered in evidence the question of whether it was or was not admissible is not before us and we will not discuss it. The fact that the record was in the possession of the attorney for the plaintiff removes the imputation of bad faith cast upon him by the defendant.

Since we find no error in the record brought to us from the trial court the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.