THE NORTHERN TRUST COMPANY, Special Guardian of the Estate of Jason Milstein, a Minor, *et al.*, Plaintiffs-Appellants, *v.* SKOKIE VALLEY COMMUNITY HOSPITAL *et al.*, Defendants-Appellees.

First District (4th Division) No. 79-452

Opinion filed February 28, 1980.

James H. Canel, Ltd., and Jack Ring, Ltd., both of Chicago (James H. Canel, of counsel), for appellants.

Lord, Bissell & Brook, of Chicago (Harold L. Jacobson and Hugh C. Griffin, of counsel), for appellees Skokie Valley Community Hospital, Judy Reuter, and Victoria Matusik.

Neil K. Quinn, of Pretzel, Stouffer, Nolan & Rooney, of Chicago (Robert Marc Chemers and Joseph B. Lederleitner, of counsel), for appellee Milton Alter.

Brian C. Fetzer, of Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellee Howard L. Woolf.

Wildman, Harrold, Allen & Dixon, of Chicago (Maurice J. Garvey and Kay L. Schichtel, of counsel), for appellee James MacLean.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The plaintiffs, Northern Trust Company, as special guardian of the estate of Jason Milstein, and Michael and Lois Milstein, Jason's parents, brought a medical malpractice action against the defendants, the Skokie Valley Community Hospital (Skokie Valley), Judy Reuter, Victoria Matusik, Vera Seals and Drs. Milton Alter, Howard L. Woolf, Allen E. Winer and James MacLean, alleging that Jason Milstein's permanent brain damage was caused by the defendants' negligence at the time of his birth. At the close of the plaintiffs' case, the court directed a verdict for Matusik and Seals and by agreement dismissed Winer. The jury returned a verdict for the remaining defendants, and the court entered judgment.

On appeal, the plaintiffs argue the evidence so overwhelmingly favors them that this court should enter a judgment notwithstanding the verdict. Alternatively, the plaintiffs argue significant trial errors denied them a fair trial, and they ask that the cause be reversed for a new trial.

On September 13, 1967, Lois Milstein began to experience the early stages of labor. She was in the ninth month of her first pregnancy which had proceeded normally. She talked to her obstetrician, Dr. Woolf, on the telephone, and he instructed her to go to Skokie Valley. She and her husband arrived at Skokie Valley about 2:30 a.m. She was in the labor room at 2:40 a.m.

The hospital staff on duty in the labor/delivery suite that morning consisted of Reuter, who was a registered nurse, and two obstetrical technicians, Matusik and Seals. The medical officer on duty was Dr. Alter, an obstetrician and gynecologist.

At 3 a.m. Alter performed a vaginal examination of Lois Milstein. Also at 3 a.m., Dr. Woolf was advised by Reuter that Lois Milstein had arrived at the hospital. Dr. Woolf gave orders for Lois Milstein to be given

50 milligrams of Demerol and 25 milligrams of Phenergan if she became uncomfortable. Dr. Woolf was to be notified when this occurred. Dr. Woolf also left standing orders to be advised when his patient's dilation reached seven to eight centimeters.

Lois Milstein was examined by Reuter, Seals and Matusik at regular intervals. The fetal heart tones were checked with a fetoscope at 3:45 a.m., 4:15 a.m., 4:50 a.m., 5:10 a.m., 5:25 a.m. and 5:40 a.m. and were within the normal range on each occasion according to the medical charts. Dr. Alter also checked the fetal heart tones on at least three occasions and found them normal. However, Lois Milstein testified that Reuter listened to the fetal heart tones between 4:45 a.m. and 5 a.m. Reuter then went to the labor room door where, according to Lois Milstein, she stated "Get in touch with Woolf; there's a problem."

At 5:10 a.m. Dr. Alter performed a second vaginal examination. He found Lois Milstein's dilation was three to four centimeters and that her contractions were two minutes apart. He anticipated that her labor would probably take another three to four hours. Because she was beginning to feel uncomfortable, the Demerol and Phenergan were administered in the prescribed dosages and Dr. Woolf was notified of this fact. Dr. Woolf normally arrived at the hospital about 7 a.m. However, after being notified that Lois Milstein had been given the prescribed drugs, he decided to proceed to Skokie Valley since Lois Milstein was in labor and he had other patients to see.

At 5:55 a.m. Lois Milstein was again examined by Dr. Alter. This examination revealed that she had dilated to a full ten centimeters. The fetal heart tones were checked and found to be normal at this time. Dr. Alter thought delivery was at least 30 minutes away.

At 5:58 or 6 a.m., Reuter decided to transfer Lois Milstein to the delivery room. After the transfer was effected, Reuter discovered the fetal heart tones were abnormally low at 80, faint and irregular. She listened two more times and got the same low reading each time. Reuter had just finished checking the fetal heart tones when Dr. Woolf arrived in the delivery room about 6 a.m. Reuter advised him of the low fetal heart tone readings. Dr. Woolf checked the fetal heart tones himself, ordered oxygen, and took over the delivery and subsequent resuscitation effort. To facilitate delivery, Dr. Woolf administered a pudendal block, a local anesthesia, and performed a left medial episiotomy. Dr. MacLean arrived in the delivery room at 6:15 a.m. Jason Milstein was delivered at 6:18 a.m. by spontaneous delivery. At birth he had no heart beat, no respiration and was flaccid.

After the baby was delivered, Dr. Woolf asked Dr. MacLean to put Lois Milstein under general anesthesia. Dr. MacLean did so. At this point, Dr. MacLean had not been told of the low fetal heart tones and did not know the baby was in distress. As Jason Milstein was being delivered, Dr.

Woolf suctioned his mouth, nasal pharynx and nose with a bulb syringe. Once the baby was delivered, Dr. Woolf placed him on a flat surface. He put a folded towel under the baby's neck to extend his head. He then placed a DeLee tracheal catheter in Jason Milstein's larynx, down the trachea. He kept the catheter in the proper position by keeping one finger of his left hand in the baby's mouth. Dr. Woolf had his right hand on the baby's chest so that two fingers were between the upper and lower third of the sternum. A hand on the baby's chest indicates whether there is bilateral inspiration of the chest and also allows the heartbeat to be felt. In ventilating the baby's lungs, Dr. Woolf held the catheter between his teeth and held the baby's chin up. Reuter delivered oxygen to Dr. Woolf's mouth with the oxygen tube and Dr. Woolf delivered it through the catheter to the infant's lungs. There was no resuscitator or anesthesia bag in the delivery room at the time of the birth, and no one monitored Jason Milstein's heart tones during the resuscitation.

Dr. Woolf performed the resuscitative actions for approximately 10 minutes. The baby's color changed from blue to pink which indicated that his circulatory system was receiving oxygen. The baby began taking breaths on his own, but whenever Dr. Woolf would stop breathing for him, Jason Milstein would stop breathing. Dr. Woolf then asked Dr. MacLean to insert an endotracheal tube. Dr. MacLean intubated Jason Milstein under direct vision, using a laryngoscope and an endotracheal tube. The baby was then connected to a mechanical Bennett resuscitator which had been brought to the delivery room by Reuter. Dr. Alter repaired Lois Milstein's episiotomy while Dr. Woolf resuscitated the baby.

Additional facts and testimony which are relevant to the issues on appeal will be related at the appropriate portions of this opinion.

Our disposition of this appeal obviates the need to relate damages testimony.

The plaintiffs' first argument is that the evidence presented at trial so overwhelmingly favors them when viewed in the light most favorable to the defendants (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), that this court should enter a judgment notwithstanding the verdict for the plaintiffs. The plaintiffs make separate allegations of negligence against Reuter, Skokie Valley, and Matusik. The first is Reuter's alleged failure to communicate the condition of Lois Milstein to Drs. Woolf, Alter and MacLean.

The plaintiffs argue Reuter detected an abnormal condition when she took the fetal heart tones between 4:45 and 5 a.m. and that she then stated "Get Woolf. There's a problem." They further argue that Reuter was negligent by not informing Woolf of the "problem," and that this omission permitted the fetal distress to continue untreated for more than an hour prior to delivery. The plaintiffs point out that Reuter's "admission," as

testified to by Lois Milstein, was never denied by Reuter. The plaintiffs contend that the entries on the medical chart are consistent with the existence of an emergency even though they concede that the chart itself may not establish such a situation.

The plaintiffs' expert witnesses, the defendants' expert witnesses, and the attending and treating neurologist each testified that Jason Milstein's oxygen deprivation commenced 20 minutes to an hour prior to the time he was delivered at 6:18 a.m. The experts also said that if a problem had been detected by Reuter between 4:45 and 5 a.m. and she failed to communicate that problem to Dr. Woolf, it was a deviation from the standard of acceptable nursing practice.

Reuter testified that she had no recollection of any of the events which occurred before 6 a.m. that morning. Reuter said, however, that the chart accurately reflected her findings. She also said that in the event of an emergency she would notify the medical officer on duty.

Lois Milstein testified that she was taken to the delivery room five or 10 minutes after Matusik told someone to get Dr. Woolf because there was "a problem," and that Dr. Woolf arrived in the delivery room five or 10 minutes after that.

The medical chart from the labor room, which was introduced into evidence, shows that Lois Milstein was checked by the staff at seven different times between 3:45 a.m. and 5:55 a.m. The fetal heart tones during that period of time ranged from 140 to 152. The chart contains no mention of a "problem" or "emergency." During opening statements the attorney for Skokie Valley and Matusik commented that "a chart does not contain everything done" and that the jurors should listen to the testimony.

Drs. William Gottschalk and Thomas McElin testified that the nursing care rendered in the case was in accordance with the standard of care to be given by a reasonably well qualified nursing staff in a community hospital at that time and place; that the number and manner of internal examinations were in accordance with the accepted standard of medical care; that the method and manner of measuring Lois Milstein's fetal heart tones during labor met the accepted standards for nursing care; and that the failure of Matusik to call an anesthesiologist to the scene prior to 5:55 a.m. was not a deviation from the accepted standard of care.

Dr. Ralph Benson, the plaintiffs' expert on nursing care, testified that if events transpired in the sequence reflected either in the hospital records or as related by Lois Milstein, he had "no criticism" of the nursing care rendered.

Dr. Alter testified that he had no way of knowing whether or not the Demerol and Phenergan impaired Lois Milstein's sensorium. Dr. Woolf testified that it was a short dose. Dr. Benson testified that although

narcotics such as those can depress one's sensorium, oftentimes they will make one more lucid. Dr. Gottschalk testified that one would have no way of knowing whether or not Lois Milstein's sensorium was impaired.

Entry of judgment notwithstanding the verdict is proper only when "all of the evidence, viewed most favorably to [the opposing parties] so overwhelmingly favors [the movants] that no contrary verdict based on [the] evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 511, 229 N.E.2d 504, 514.) Because the plaintiffs are asking this court to enter judgment *n.o.v.*, this is the standard under which we must evaluate the issues of negligence.

■■ The plaintiffs initially argue Reuter's statement, as testified to by Lois Milstein, is an admission which stands uncontradicted and that it cannot be disregarded by the jury. While this is a correct statement of the law, it does not follow that the jury was obligated to believe that the statement was in fact made and therefore to conclude that the statement establishes negligence. The jury was not compelled to accept the plaintiffs' account of what happened but rather was permitted to consider surrounding circumstances and the probability or improbability of Lois Milstein's testimony. *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367; see also *Ayers v. Metcalf* (1866), 39 Ill. 307.

Based on the evidence as a whole, the jury was entitled to believe that there was no "emergency" or even a "problem" with the baby prior to the time that Reuter first detected the abnormally low fetal heart tones in the delivery room. The medical records showed normal fetal heart tones throughout the entire time that Lois Milstein was in the labor room and the defendants' experts testified that the nursing care provided to Lois Milstein met the appropriate standard of care. Furthermore, the jury would have been entitled to believe that the Demerol and Phenergan had some effect on Lois Milstein's perceptions. This is particularly true in light of Lois Milstein's testimony that she was taken to the delivery room five or 10 minutes after Reuter made the "Get Woolf" statement, a version of the events which conflicts with the plaintiffs' contention that the statement was made an hour before the delivery. Under these circumstances we cannot say that when the evidence is viewed most favorably to Reuter that it so overwhelmingly favors the plaintiffs that no contrary verdict could ever stand. We thus reject this first argument of the plaintiffs.

■■ The plaintiffs next argue Skokie Valley was negligent in failing to have a resuscitator present in the delivery room.

During opening statements, Dr. Woolf's attorney conceded that there was no mechanical resuscitative equipment present in the delivery room at the time Jason Milstein was delivered. The plaintiffs rely on the testimony of Dr. McElin, Skokie Valley's expert, who said:

"I thought I was asked the question was it proper and correct in

1967 for a Bennett respirator to be in the delivery room, and my answer to that question was no. I did not feel that it was necessary to be there. You do not know for some several or more minutes—3, 5, 6, 7—whether you're going to want a Bennett; and, therefore, to have one in every delivery room would not be cost effective, not logical.

You would have one or two in a delivery unit in a central place. The nurse can be told to get it at minute 3 and have it there at minute 4."

Dr. McElin also testified "I do, indeed, believe that all equipment necessary for immediate neonatal resuscitation should be and should have been in every delivery room of a maternity."

Although these two portions of Dr. McElin's testimony appear somewhat contradictory on their face, the jury was entitled to accept Dr. McElin's opinion that it was not necessary to have the Bennett resuscitator in the delivery room until the time it was needed.

The plaintiffs next argue Skokie Valley is responsible for the professional qualifications of its medical staff appointments and that Dr. MacLean was not professionally qualified to practice obstetrical anesthesia and was untrained in the resuscitation of the newborn.

Skokie Valley's administrator, Ralph Hutchins, testified that the hospital is responsible for the appointment and the professional quality of its medical staff. Hutchins also testified that staff privileges at Skokie Valley were afforded to doctors only on the recommendation of the credentials committee, which is made up of various members of the medical staff.

Dr. MacLean was a licensed anesthesiologist. He attended Northwestern University's medical school and did his residency training at Rush Presbyterian-St. Luke's Hospital. He practiced as an anesthesiologist at St. Joseph's Hospital before being appointed to the staff at Skokie Valley. At Skokie Valley Dr. MacLean performed obstetrical anesthesia on numerous occasions prior to this case and had worked with Dr. Woolf during many deliveries. During his residency he did not receive special training in obstetrical anesthesia.

The plaintiffs argue that had Dr. MacLean been professionally qualified he would have known his responsibilities; known that he had a duty to both mother and baby; known that the baby's fetal distress was a medical emergency; known that putting Lois Milstein to sleep was elective and without medical indication; and known that it was urgent and desirable to vigorously resuscitate the distressed baby.

The plaintiffs rely on cases where the hospital knew it had an incompetent physician on its staff (*Mitchell County Hospital Authority v. Joiner* (1972), 229 Ga. 140, 189 S.E.2d 412), or appointed an unqualified

physician (*Purcell v. Zimbelman* (1972), 18 Ariz. App. 75, 500 P.2d 335). That is not the situation presented here. There was no evidence presented to show that the hospital had notice of any lack of competence on the part of Dr. MacLean.

Further, we do not believe any of the evidence showed that the hospital, in appointing Dr. MacLean to its staff, was appointing an "unqualified" physician. There is no question but that Dr. MacLean was a licensed anesthesiologist and the evidence fails to demonstrate that additional qualifications were necessary for an anesthesiologist who would be working as an obstetrical anesthesiologist. This conclusion obviates the need to address the plaintiffs' later argument that the court erred in refusing their tendered instruction concerning Skokie Valley's negligent hiring of Dr. MacLean.

The plaintiffs also argue the court erred in directing a verdict for Matusik at the close of the plaintiffs' case. They submit that circumstantial evidence demonstrates that Reuter was speaking to Matusik when she said "Get Woolf. There's a problem," and that Matusik called Dr. Woolf but failed to advise him of the problem.

The only evidence in the record concerning Matusik established that she was one of the obstetrical technicians who prepared Lois Milstein for delivery upon her arrival at Skokie Valley and that she took a fetal heart tone reading at 4:50 a.m. Plaintiffs' speculative arguments, which they characterize as circumstantial evidence, are an insufficient basis for us to reverse the directed verdict as to Matusik.

The plaintiffs next argue Drs. Woolf, MacLean and Alter are each guilty of medical malpractice. The plaintiffs argue that had Jason Milstein been delivered earlier; had he been intubated under direct vision with an endotracheal tube; had he had the benefits of meaningful closed chest massage and sodium bicarbonate, then such a vigorous resuscitative effort would have resulted in a normal child without neurologic deficit.

The medical experts who testified on behalf of the plaintiffs concerning the care tendered by the physician-defendants were Dr. John Madden, Dr. William Gottschalk and Dr. Ralph C. Benson.

Dr. Madden testified that he is not an obstetrician or anesthesiologist. He is board certified in pediatrics and neonatology. The study of perinatal and neonatal medicine deals with the fetus through the first 28 days of life. Concerning Dr. MacLean, Dr. Madden testified that it was a deviation from the standard of care for the anesthesiologist not to attend to the immediate emergency concerning Jason Milstein. He also said Dr. MacLean deviated from the standard of care by not intubating the baby at birth. Dr. Madden said he was not familiar with the standard of care for Chicago obstetricians in 1967 insofar as which device would be used to

assist an infant born with respiratory distress. He said a more vigorous attempt at oxygenating the infant should have been initiated at an earlier point with an endotracheal tube or bag resuscitator. He did not think the tracheal catheter was an adequate technique of resuscitation. The use of the DeLee catheter had been superseded by more effective modes of ventilation. Intubation with an endotracheal tube was recommended by standard text books in 1967 and now. In Dr. Madden's opinion, Jason Milstein could have been resuscitated without neurologic damage.

Dr. Gottschalk is board certified in obstetrics/gynecology and anesthesiology. He testified that it was a deviation from the standard of care for Dr. MacLean not to attend to the emergency concerning Jason Milstein. He admitted his opinion would be different if the anesthesiologist did not know the baby was born under fetal distress. Dr. Gottschalk conceded Dr. MacLean could not leave the mother while he was administering anesthesia to her. He further testified that he did not believe the standards of practice of 1967 were met by Dr. Woolf in the resuscitation of Jason Milstein and that it was a deviation from the standard of care not to administer sodium bicarbonate to the baby. However, he admitted that it is now known that the sodium bicarbonate can and does cause liver damage to the point of necrosis.

Dr. Benson is board certified in obstetrics/gynecology. He testified that it was a deviation from the standard of care for Dr. Alter not to take charge and deliver the baby earlier, and that Jason Milstein's chances for survival would have been improved by earlier delivery.

The medical experts testifying on behalf of the defendants on the issue of the medical care rendered by them were Drs. Thomas McElin, Edward Brunner, and John Henry Isaacs.

Dr. McElin is a board certified professor of obstetrics and gynecology. He said it was consistent with the standard of care in 1967 for Dr. Alter not to accompany the patient to the delivery room but said his opinion would be different if a "problem" had in fact been observed while Lois Milstein was still in the labor room. Dr. McElin said in general the care rendered by Dr. Alter was proper and appropriate and according to the standards of 1967. Dr. McElin also said it was his preference to intubate under direct vision in the resuscitation of the newborn; however, he was not critical of the use of the DeLee catheter for a brief period. Dr. McElin said Dr. Woolf's medical treatment was proper in all respects and conformed with the standard of care and that Dr. Woolf's resuscitative efforts in no way contributed to a neurological deficit in Jason Milstein. He said the use of the tracheal catheter was an appropriate method of delivering oxygen to Jason Milstein. Dr. McElin testified that the administration of sodium bicarbonate to Jason Milstein would have been

a good idea and posed no risks. Finally, Dr. McElin said Dr. MacLean conformed to the 1967 standard of care by staying with Lois Milstein while she was under the general anesthesia.

Dr. Brunner is board certified in anesthesiology. He said it would have been consistent with good medical practice to intubate the baby at the head of the table where Dr. MacLean was attending to Lois Milstein.

Dr. Isaacs is board certified in obstetrics/gynecology. He testified that the administration of sodium bicarbonate might have helped Jason Milstein; however, he also said it was not part of the standard of care required of an obstetrician in 1967. He said there was no causal connection between the acidosis and Jason Milstein's brain damage. Dr. Isaacs also testified that the nature of Dr. Woolf's resuscitative efforts were correct and proper in all respects and conformed with the 1967 standard of care. He said the use of direct laryngoscope and infant endotracheal intubation was not standard practice in the Chicago area in 1967. The cardiac chest massage performed by Dr. Woolf was correct and proper and in accordance with the standard of care. Dr. Isaacs also said it was good medical practice for the anesthesiologist to stay at the mother's side while she was in a state of general anesthesia.

In connection with the expert medical testimony, the plaintiffs initially argue that because Dr. Isaac's area of special interest was gynecologic oncology it was unethical for him to testify an an expert in this case under the standards of the Illinois Medical Society. The standards provide in part that an expert must be currently active in the practice of the medical subject under discussion. The plaintiffs also contend Dr. Isaacs testified that his opinion was based on what was customarily done as opposed to the standard of care and that the court improperly refused to strike his testimony, because evidence of custom and practice does not conclusively establish a standard of care.

■■ Dr. Isaacs testified that he is board certified in obstetrics and gynecology and that he has been in the private practice of obstetrics and gynecology since 1954. His credentials as an expert were not challenged at the time of the trial. We thus will not consider the plaintiffs' initial contention that it was unethical for Dr. Isaacs to testify in this case.

It appears clear that Dr. Isaacs' opinions were phrased in terms of the appropriate standard of care rather than, as plaintiffs contend, in terms of custom and practice. For example, after posing a lengthy hypothetical, defense counsel concluded the question by asking:

> "Doctor, assuming those facts, I would ask you whether or not you have an opinion based upon a reasonable degree of medical and surgical certainty whether or not the resuscitative efforts provided to the infant by the obstetrician were in conformance with the

accepted standard of care to be expected of a reasonably competent obstetrician practicing in a community hospital in the Chicagoland area in 1967?"

Other requests for Dr. Isaacs' opinion were also phrased in terms of standard of care.

The plaintiffs allege Dr. Woolf deviated from the standard of care in his failure to resuscitate Jason Milstein promptly by not ensuring that the baby was intubated with an endotracheal tube; by not administering sodium bicarbonate; and by not effectively performing closed chest massage. Judgment *n.o.v.* as to Dr. Woolf is not appropriate in light of the testimony by defendants' experts that Dr. Woolf's medical treatment was proper in all respects and conformed with the standard of care, that the resuscitative efforts in no way contributed to a neurological deficit in the baby, and that administration of sodium bicarbonate was not part of the standard of care required of an obstetrician in 1967.

The allegation against Dr. Alter is that he was negligent in not taking charge and delivering Jason Milstein earlier. Again, judgment *n.o.v.* would be inappropriate here in light of the expert testimony by Dr. McElin that, in general, the care rendered by Dr. Alter was proper and appropriate and according to the standards of 1967.

The allegation of negligence against Dr. MacLean is that he failed to resuscitate the baby effectively. Dr. McElin testified that Dr. MacLean conformed to the 1967 standard of care by staying with Lois Milstein while she was under the general anesthesia. Dr. Isaacs also said it was good medical practice for Dr. MacLean to remain at the mother's side while she was in a state of general anesthesia. In light of this testimony, the evidence failed to establish that Dr. MacLean had any responsibility for resuscitating Jason Milstein and we cannot say the *Pedrick* standard for entering judgment *n.o.v.* has been met.

The plaintiffs next argue the jury was given no guidance as to the definition of the term "standard of care" and that the standard should be defined as the highest degree of care. In making this argument the plaintiffs rely upon a question submitted to the court below by the jury during the course of their deliberations. The question was:

"*Question on the Meeting* [*sic*] *of Acceptable Standards of Care.* In determining whether acceptable standards of care were met in the resuscitation of Jason Milstein, do we deal with what we believe was *proven* to be a better method of resuscitation at the time? Or, are we limited to determining *only* wether [*sic*] or not the particular method used was an acceptable method. And wether [*sic*] it was a '*better*' method or not is irrelevent [*sic*]?"

The attorneys for all parties met in court to consider the appropriate

response to this question and plaintiffs' attorney stated "I think the Jury should be directed to read the instructions which have been previously provided to them for their answer."

The jury was instructed as to the duty of a physician in accordance with the instruction submitted by the plaintiffs' attorney. That instruction was based upon Illinois Pattern Jury Instruction, Civil, No. 105.02 (2d ed. 1971), which states in part:

> "In treating a patient, a doctor who holds himself out as a specialist and undertakes service in a particular branch of medical, surgical, or other healing science, must possess and apply the knowledge and use the skill and care which reasonably well-qualified specialists in the same field, practicing in the same locality, or in similar localities, ordinarily would use in similar cases and circumstances. A failure to do so is a form of negligence called malpractice."

The plaintiffs submit that the question posed by the jury to the court is in the nature of a "special interrogatory," which was both proposed and answered by the jury. The plaintiffs interpret the question as an assertion by the jury that the plaintiffs proved a better method of resuscitation was proved to exist, was available, and was nevertheless not used by Dr. Woolf.

From this premise the plaintiffs argue that where a *better* method of resuscitation had been proved, this court should find that the defendants were negligent in not utilizing that better method, at least where the better method was available at the time of the occurrence.

Initially, we cannot accept the plaintiffs' interpretation of the question posed by the jury. It was not a "special interrogatory," and no legal significance can be read into it. At trial, the plaintiffs raised no issue concerning the alleged lack of definition of the term "standard of care." They did not submit a proposed instruction containing a new, or more detailed definition than that contained in IPI Civil No. 105.02 and, in fact, that pattern instruction was submitted by the plaintiffs themselves. Finally, the plaintiffs have not pointed out any case law to demonstrate their assertion, as we understand it, that, assuming proof of a *better* method of resuscitation, the applicable standard of care was breached by the utilization of a less desirable method.

We cannot say that the evidence here presented any more than a difference of opinion among the experts as to which method was the better one and a question of fact for the jury concerning whether the use of the DeLee catheter was a deviation from the prevailing standard of care. The jury was entitled to find for the defendants.

The plaintiffs next argue significant errors committed by both the

court and the defendants denied them a fair trial. On these issues the plaintiffs ask that the cause be reversed and remanded for a new trial.

Their first argument concerning error at trial is that the court erred in refusing to instruct the jury on their theory of the case. They object to the court's refusal of their proposed instruction No. 11, paragraph 2, which was in reference to the allegations of negligence on the part of Skokie Valley. That instruction stated:

"2. Failed to have present in the delivery room, a resuscitator for the resuscitation efforts on Jason Milstein."

The plaintiffs argue the evidence shows that resuscitative equipment was not present in the delivery room at the time of delivery and that Dr. McElin testified the standard of care required a resuscitator be present in the delivery room.

There was no evidence presented at trial that the respirator was desired or needed sooner than it was in fact put into use in the delivery room. There was similarly no evidence that the failure to have a respirator in the delivery room during a delivery which everyone expected to be normal was a violation of a standard of care for hospitals. The testimony of Dr. McElin which the plaintiffs rely upon and quote in their brief is the following:

"Mr. Canel: Is it important, doctor, in the resuscitative effort—does the standard of care require that the equipment necessary to resuscitate the newborn who is depressed at birth be present and available in the delivery room?

The Witness: I do, indeed, believe that all equipment necessary for immediate neonatal resuscitation should be and should have been in every delivery room of a maternity."

Even though the question was phrased in terms of standard of care, the response given by Dr. McElin appears to be his personal opinion rather than an assertion of the prevailing standard of care. (See *Burrow v. Widder* (1977), 52 Ill. App. 3d 1017, 368 N.E.2d 443.) Furthermore, the defendants point out that Dr. McElin also stated, "I thought I was asked the question was it proper and correct in 1967 for a Bennett respirator to be in the delivery room and my answer to that question was no. I did not feel that it was necessary to be there." Under these circumstances we believe the trial court was correct in refusing plaintiffs' proposed instruction concerning the resuscitator because there was no evidence that the hospital deviated from a standard of care in this regard.

The plaintiffs next argue the credibility of Lois Milstein was improperly, prejudicially and repeatedly attacked by speculative unsupported inferences that a narcotic impaired her sensorium. The plaintiffs assert that her credibility was attacked by Dr. Alter's attorney in

his opening statement and closing argument and by various attorneys during cross-examination of some of the witnesses with respect to the use of Demerol and Phenergan as potentially impairing Lois Milstein's perception of the events that occurred.

At trial, Dr. Gottschalk was asked whether a person who has been given Demerol and Phenergan is affected in his ability to correlate time accurately. Dr. Gottschalk responded that patients react differently to such a combination of drugs, that some patients do have considerable changes in their sensorium, and that recollection of time can be part of the change in sensorium. He also said that in general one would expect some analgesia and probably some sedation and possibly some disturbance of the sensorium in such circumstances. Dr. Benson agreed that there was nothing in the record to give one an opportunity to know the effect or lack of effect of the drugs on Lois Milstein. Finally, Dr. Alter testified that Demerol is a narcotic which causes euphoria, analgesia and sedation and that Phenergan is a tranquilizer.

In his opening statement Dr. Alter's attorney said in part:

"[I]t is significant to know that the medication, sedation, narcotic is given because, of course, a person under a narcotic or under sedation is not very active insofar as their time recollection or their ability to record time, and especially in active labor."

During closing arguments, Dr. Alter's attorney said:

"What effect does a lady who has had Demerol and Phenergen, what effect does that have on somebody's recollection? I don't think anyone really knows, but it is something we have to consider. Demerol is a narcotic."

■■ Considerable latitude must be afforded counsel in opening statement or closing arguments. (*Hopwood v. Thomas Hoist Co.* (1966), 71 Ill. App. 2d 434, 219 N.E.2d 76.) We cannot say that the inferences argued by Dr. Alter's counsel were unsupported in light of the rather extensive testimony concerning the possible effect of the drugs which had been administered to Lois Milstein.

The plaintiffs' next argument concerns the expert testimony. Prior to trial, Dr. Gottschalk was disclosed to the defendants as the plaintiffs' expert regarding obstetrical care, anesthesia and resuscitation, while Dr. Benson was disclosed as the plaintiffs' expert on obstetrical nursing practice. Six months prior to trial, in a deposition, Dr. Gottschalk gave his opinion of the propriety of the care rendered by Reuter and Skokie Valley in addition to his opinions as to Drs. MacLean and Woolf. Dr. Alter and Skokie Valley served a trial subpoena on Dr. Gottschalk and the plaintiffs' counsel was aware of this on the first day of testimony at the trial. During the plaintiffs' case, counsel for Skokie Valley asked Dr. Gottschalk if he had previously expressed an opinion on the quality of the

obstetrical care rendered by the hospital. Plaintiffs' counsel objected to this line of questioning as being beyond the scope of direct examination and the objection was sustained. Dr. Gottschalk was then recalled, during the defendants' case, to testify for Skokie Valley.

The plaintiffs claim Dr. Gottschalk should have been precluded from testifying for the defendants because he was not disclosed as the expert for Skokie Valley or Dr. Alter prior to trial and the plaintiffs' discovery depositions of the experts were directed only to the party for whom they were disclosed. The plaintiffs also complain of the fact that Dr. McElin was disclosed only by Dr. Alter as his expert, and yet he testified for all the defendants.

The plaintiffs rely on *Simpson v. Johnson* (1977), 45 Ill. App. 3d 789, 360 N.E.2d 144, and *Brichacek v. Hampton* (1964), 54 Ill. App. 2d 284, 203 N.E.2d 737, in making this argument. In *Simpson*, the appellate court reversed a judgment for the defendant/physician in part because the defendant did not disclose one of his experts to the plaintiff until seven days after trial commenced and, according to the post-trial motion, the expert was known to and had treated one of the jurors. The case before us is clearly distinguishable from *Simpson* in that the plaintiffs here had notice, on the first day of testimony at trial, that some of the defendants were considering calling Dr. Gottschalk as their witness.

Plaintiffs rely on *Brichacek* as authority for the proposition that defendants acted improperly by inferring that plaintiffs were manipulating Dr. Gottschalk's testimony. *Brichacek* is also distinguishable from this case. That case involved comments on the plaintiff's failure to call a witness rather than the allegedly improper calling of too many witnesses as here.

■■ The plaintiffs received notice of the possibility that Dr. Gottschalk might be called by the defendants when they learned of the subpoenas on the first day of testimony. Further, the plaintiffs themselves prevented Dr. Gottschalk from giving his opinion concerning the hospital and nursing care during the plaintiffs' case. Thus, the defendants had no choice but to recall him during the presentation of their case if they wished to elicit these opinions. As the defendants point out, the plaintiffs make no claim of surprise concerning Dr. Gottschalk's testimony. The trial court has broad discretion in permitting expert testimony. (*Burns v. West Chemical Products, Inc.* (1973), 12 Ill. App. 3d 947, 299 N.E.2d 455.) Considering the circumstances related above, we conclude it was within the trial court's discretion to permit Dr. Gottschalk to testify for the defendants.

We similarly reject the argument as it pertains to Dr. McElin because, during his deposition by the plaintiffs, he was questioned concerning his opinion as to the medical care rendered by each of the defendants. Under these circumstances it would have been unfair to the defendants to limit

Dr. McElin's testimony at trial to his opinion of Dr. Alter's medical treatment, merely because Dr. Alter was the only one to disclose Dr. McElin as his witness.

During closing arguments, counsel for Skokie Valley stated in part: "Dr. Gottschalk was put on, and his testimony was confined to everybody but the hospital when [plaintiffs' counsel] put him on. And we had to call him back to get any comments on what the hospital—."

Plaintiffs' counsel objected at this point, saying it was improper argument. Defense counsel continued "and we were prohibited from asking him any questions because there was nothing stated against the hospital when he was originally called."

■ The plaintiffs contend this argument planted in the jury's mind the inference that the plaintiffs were manipulating Dr. Gottschalk's testimony. In light of the broad latitude that must be afforded counsel in closing arguments (*Hopwood*), we conclude the above-quoted statement was nothing more than a fair description of what occurred at trial.

The plaintiffs next argue they were prejudiced by inferences and speculation as to other intervening causes without any evidence being offered to support those inferences. They contend that some of the defense counsel, during examination of Drs. Gottschalk and Madden, attempted to suggest that there was a possibility of umbilical cord occlusion occurring within a few minutes prior to Jason Milstein's birth and that this was the sole cause of his brain damage.

We reject this argument in light of a comment made by Dr. Benson, one of plaintiffs' experts. On cross-examination Dr. Benson was discussing the "number of possibilities" which could have caused Jason Milstein's oxygen deprivation and resulting brain damage. He stated, in part, "It can be either a cord accident, as we call it, a cord compression, or a *cord occlusion*. It can be hemorrhage. It can be a ruptured uterus." The plaintiffs are thus incorrect in contending that there was no evidence of "umbilical cord occlusion" being a possible cause of the injury.

The plaintiffs also contend they were prejudiced by the court's refusal to allow them to argue to the jury their understanding of the meaning of standard of care. During closing arguments the plaintiffs' counsel made the statement "This case involves whether or not Jason Milstein received the best possible care." Defense counsel objected and the court sustained the objection.

■■ The proposition is well settled that it is improper for an attorney to misstate the law before the jury. (*Ryan v. Monson* (1961), 33 Ill. App. 2d 406, 179 N.E.2d 449.) The jury was correctly instructed concerning the duty of a physician in rendering medical care. That duty is not one of "best possible care," but rather whether the physician possessed and

applied the knowledge and used the skill and care which a reasonably well-qualified specialist in the same field, and practicing in the same locality, would ordinarily use in similar cases and circumstances. The trial court was correct in sustaining the objection to this portion of plaintiffs' argument.

The plaintiffs next argue they were prejudiced by repeated misleading cross-examination of the expert witnesses. Specifically, they object to Dr. Benson being asked whether his opinion would be different in the absence of Lois Milstein's testimony that Reuter said "Get Woolf. There's a problem." The plaintiffs argue this question was improper in the absence of supportive evidence.

The medical charts showed no indication of an emergency or problem with the fetus prior to the time that Lois Milstein was transferred to the delivery room. The medical personnel who were present at the pertinent time testified that the lowered fetal heart tones were not detected until Lois Milstein was in the delivery room. We thus cannot agree that there was no evidence to support the hypothetical question objected to by the plaintiffs. Lois Milstein's testimony concerning a problem was inconsistent with other evidence from which a normal course of labor could be inferred.

■ The plaintiffs next argue the trial court erred in refusing to advise the jury of a stipulation by Skokie Valley hospital that no other patients were in the labor and delivery suite during the evening and morning in question. The plaintiffs argue the stipulation was relevant in that it would have impeached certain testimony of Reuter, Skokie Valley and Dr. Alter. Without detailing plaintiffs' argument concerning how this impeachment would have occurred, we believe the trial court was correct in ruling that the stipulated fact was not relevant because the number of patients present in the labor and delivery suite that night would not have altered the applicable standards of care. There was no testimony which would have led the jury to believe that other patients were present, and we cannot say that the court's ruling on the stipulation prejudiced the plaintiffs in any way.

The plaintiffs' final argument is that the number of prejudicial errors, viewed as a group, mandate the necessity of a new trial.

In light of our conclusions as to each of the alleged errors, we must also reject this final argument.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.